IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHNNY JONES,<br><br>Plaintiff,<br><br>v.<br><br>WEXFORD HEALTH SOURCES, INC. and DR. MARSHALL JAMES,<br><br>Defendants. | Case No. 17-cv-8218<br><br>Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Johnny Jones brought this case against Defendants Wexford Health Sources, Inc. and Dr. Marshall James. Jones alleges that James was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment and that James's care constituted medical malpractice. Jones further alleges that Wexford is vicariously liable for James's malpractice. The defendants now move for summary judgement. For the reasons stated below, the Motion for Summary Judgment [90] is granted as to the Eighth Amendment claim and denied as to the medical malpractice claims against Jones and Wexford.

This opinion also addresses motions Jones filed in relation to the summary judgement motion, one to bar consideration of the defendants' expert witness's testimony [104] and one to strike certain defendant responses to Jones's Statement of Additional Facts [108]. For the reasons stated below, the motion to bar the testimony is denied and the motion to strike certain responses is dismissed as moot**.**

## BACKGROUND[1]

Johnny Jones is a 47-year-old man who, from February 2014 to June 2016, was an inmate with the Illinois Department of Corrections (IDOC). DSOF ¶ 2. For the period at issue here, he resided at the Sheridan Correctional Center in LaSalle County. DSOF ¶ 1. Dr. Marshall James is a physician who is currently employed by the Marram Health Clinic in Gary, Indiana. DSOF ¶ 3. From September 2014 to October 2016, he was employed by Wexford Health Sources, Inc. as the medical director at Sheridan. Dr. James Dep. 11:11-14, Dkt. 91-2 at 4. Wexford is a correctional healthcare company that is contracted to provide healthcare to IDOC inmates. DSOF ¶ 4.

On Saturday, November 14, 2015, Jones was playing basketball. DSOF ¶ 13. He jumped into the air for a rebound and, while in the air, felt and heard something snap. *Id*. Guards helped Jones from the ground and took him to be examined by a nurse. *Id*. The nurse evaluated Jones and noted that his left knee did not have swelling, tenderness, or bruising. *Id*. The nurse called James to discuss the injury and then provided Jones with ibuprofen and crutches. PSOF ¶ 6. Jones was also instructed to rest and elevate his left leg.

---

[1] The facts in this Background section are undisputed unless otherwise noted. The defendants' Rule 56.1 Statement of Facts (Dkt. 91) is abbreviated as "DSOF". Jones's Rule 56.1 Statement of Facts (Dkt. 102) is "PSOF". Jones responded to the defendants' Statement of Facts at Dkt. 101 and the defendants responded to Jones's Statement of Facts at Dkt. 107. Both parties assert several general and specific violations of Local Rule 56.1 in their counterpart's statement of facts, including in a "Motion to Strike" filed by Jones. Dkt. 108. Whether to require strict compliance with Local Rule 56.1 is in the Court's discretion. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019). The objections raised here are not dispositive to the outcome. The Court addresses particular statements of fact or evidence in the opinion as is necessary. Jones's Motion to Strike is dismissed as moot.

2

The next Monday, November 16, Jones returned to the healthcare unit to be seen by James. DSOF ¶ 14. James conducted a twenty-minute exam, during which he noted increased swelling and pain in the left knee. *Id.*; PSOF ¶ 8. Jones reported his knee pain as being an eight out of ten. PSOF ¶ 8. Based on his examination, James prescribed ibuprofen, crutches, and rest. DSOF ¶ 14. He ordered to see James as needed, but did not schedule a follow-up appointment. PSOF ¶ 25. James also ordered an X-ray in order to "rule out" a ruptured patellar tendon as the source of Jones's pain. PSOF ¶ 9. The X-ray showed osteoarthritis of the knee joint, mild swelling, and slightly high riding of the patella. DSOF ¶ 15. It did not show any loose bodies or evidence of an acute boney fracture. *Id.* After reviewing the X-ray, James stuck with the "conservative treatment" plan he had prescribed. PSOF ¶ 19.

On December 8, James again examined Jones. PSOF ¶ 26. He observed persistent left knee pain and swelling and displacement of the patella. Dr. James Dep. 37:6-9, Dkt. 91-2 at 11. In response, James referred Jones for an MRI. DSOF ¶ 17. Before an inmate is treated with an off-site medical procedure, such as an MRI, Wexford required that the referral be sent to its headquarters for a "collegial review." *Id.* After their approval, James was not involved in the scheduling of off-site procedures. *Id.*

James presented Jones's case at a collegial review on December 15, and an MRI was authorized. PSOF ¶ 28. On December 29, Jones submitted a prison grievance complaining of the delay in getting an MRI and expressing concern that he would not have time to recover from a potential surgery before his release. PSOF ¶ 30. On

3

January 18, 2016, Jones received an MRI at Valley West Hospital. DSOF ¶ 18. The scan showed a complete tear of his patellar tendon at its origin. DSOF ¶ 19.

On February 8, Jones met with an orthopedic surgeon, Dr. Ankhur Behl. DSOF ¶ 6; PSOF ¶ 32. Eight days later, Behl performed patellar reconstruction surgery on Jones's left knee. PSOF ¶ 35. According to Behl, the most difficult aspect of a "longer-standing rupture of the patellar tendon" is that scar tissue accumulates, making repositioning the kneecap difficult. In Jones's case there "was a lot of scar down to the femur." Dr. Behl Dep. 20:1-24, Dkt. 91-4 at 6. Nevertheless, Behl described the surgery as successful. *Id.* at 27:15. In June of that year, Jones was released from prison. DSOF ¶ 2.

After release, ongoing problems with his knee led Jones to seek treatment from another orthopedic surgeon, Dr. Nikhil Verma. DSOF ¶ 7; PSOF ¶ 37. On October 11, 2016, Verma performed surgery on Jones's left knee to remove scar tissue. PSOF ¶ 39. Verma then ordered physical therapy to maximize the surgery's effectiveness, but Jones's adherence was inconsistent. DSOF ¶ 24.

After his first surgery, Jones had a knee flexion of 90 degrees. DSOF ¶ 32. After the second, his flexion improved to 120 degrees. *Id.* Normal flexion is generally around 130 degrees. Dr. Verma Dep. 39:20-21, Dkt. 91-5 at 11. To this day, Jones experiences a limited range of motion, stiffness, and persistent and chronic pain in his knee. PSOF ¶ 40. On November 13, 2017, Jones sued James and Wexford to recover for the harms arising from their alleged deliberate indifference and negligence in their treatment of his knee injury.

4

**PRELIMINARY ISSUES**

Before we turn to summary judgment, two preliminary issues must be addressed: whether the Jones has pled a *Monell* claim; and whether the Court may consider the testimony of the defendants' expert witness.

The Court also notes with disapproval the defendants' failure to include a "Statement of Facts" section in their memorandum supporting the Motion. As this Court very recently noted, a "Local Rule 56.1 statement of facts is not a substitute for a statement of facts contained in a supporting memorandum of law." *Stark v. Johnson & Johnson*, No. 18 CV 06609, 2020 WL 1914767, at *1 (N.D. Ill. Apr. 20, 2020). Omitting the section "causes an undue burden on the Court to sift through mounds of paper to ferret out the material facts at issue" and subverts the page limit imposed by Local Rule 7.1. *Id.* Counsel are cautioned to stop substituting the Court's diligence for their own.

**I. Jones Has Not Pled a *Monell* Claim**

In their motion, James and Wexford have sought summary judgement on two claims. The first is James's alleged violation of Jones's Eighth Amendment rights. The second is James's alleged medical malpractice, for which Wexford would be jointly liable as his employer. In his Response, Jones states that his Complaint raised a third claim, that Wexford was liable under *Monell* for Jones's injuries.[2] P. Resp. 8,

---

[2] A correctional healthcare contractor cannot be held liable for constitutional violations by its employees under 42 U.S.C. § 1983 "solely because it employs a tortfeasor." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *see Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014) (affirming *Monell*'s continued application to companies like Wexford). In order to assert liability, the plaintiff must plead a more demanding *Monell* claim.

5

Dkt. 103. Because the defendants did not address this claim in its motion, Jones claims that judgement is not sought on this count and, presumably, that it will be litigated at trial. Jones is incorrect. The *Monell* claim does not survive summary judgement because no *Monell* claim was pled.

In order to make out a claim for relief, a plaintiff must provide "a short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). A *Monell* claim requires establishing that a particular constitutional violation was the result of "action pursuant to official . . . policy." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). Official policy can be shown through an "express policy" or "through a 'wide-spread practice' . . . that is so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). In order to plead a *Monell* claim, then, the plaintiff must at least allege: (1) a constitutional violation; (2) caused by an express policy or wide-spread practice.

At no point, however, does the Complaint state that the alleged constitutional violation was the result of an official policy. The closest it comes is a sentence stating: "Because of express policies or a widespread practice of defendant Wexford, or, in the alternative, deliberate indifference or negligence of Wexford's employees, plaintiff did not receive an MRI until January 18, 2016." *Id.* at ¶ 18. This does not state a *Monell* claim. First, it alleges that the delay in treatment was *either* the result of official policy or the actions of Wexford's employees, not that the former caused the later. The allegation thus is missing the causal link between an official policy and employee actions that is the heart of a *Monell* claim. The sentence also suggests that the delay

6

may have resulted from either deliberate indifference or negligence. Only deliberate indifference, however, would be a constitutional violation cognizable under *Monell*. This is not a "short and plain statement of the claim."

The defendants cannot be expected to address a claim that has not been properly raised. *See, e.g., Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (holding that a "claim which is not raised in the complaint . . . is not properly before the court"); *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (holding that "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment"). Because no claim was stated, there is no *Monell* claim to address at summary judgement or trial.

**II. The Court May Consider the Testimony of Dr. Prodromos**

The Court next considers Jones's Motion to Exclude the testimony of Dr. Chadwick Prodromos. Dkt. 104. Prodromos is a retained expert of the defendants and has submitted an expert report in this case. Jones argues that summary judgement requires a court to view facts in favor of the non-moving party. From this, Jones infers that an expert opinion may only be used at summary judgement if it similarly views the facts in the light most favorable to the non-moving party. Jones then details the various ways that Prodromos's report views facts in the defendants' favor. On this basis, Jones seeks to exclude the expert testimony from our summary judgement analysis.

Jones is correct that summary judgement requires the Court to consider "all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v.*

7

*Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). But there is no reason to think that the same standard would apply to the witnesses themselves. Jones cites no authority to support the proposition that an expert opinion must be excluded unless the expert views facts favorably to the plaintiff. Common sense suggests otherwise. Expert testimony is a form of evidence. Like all the other evidence reviewed at summary judgement, it must be evaluated by the Court in the light most favorable to the non-moving party. Imposing another layer of favorable interpretation on the witness herself would only restrict her ability to offer her expert opinion.

The cases Jones cites do not actually support his proposed rule. Jones cites *Bowens v. City of Indianapolis*, for example, to support the claim that an "expert opinion may not be used at summary judgement" if it views the facts unfavorably to the plaintiff. Dkt. 104 at 2; *see Bowens v. City of Indianapolis*, No. 1:13-CV-00072-DML-SE, 2014 WL 4680662, at *4 n.1 (S.D. Ind. Sept. 19, 2014). But in *Bowens*, the court does not exclude any expert opinion. It simply notes that the expert testimony makes contestable factual assumptions and finds that disputed facts remained for the jury. The *Bowens* court never suggest that it was barred from consulting the expert testimony. Similarly, the court in *Williams v. Mary Diane Schwarz, P.A.* was unpersuaded by an expert who assumed facts in favor of the defendant without a sound basis, and so sent the case to the jury. But the court never suggested that these factual assumptions were grounds for excluding the testimony itself. No. 15 C 1691, 2018 WL 1961143, at *6 (N.D. Ill. Apr. 26, 2018).

Another cited case, *Lightfoot v. Georgia-Pacific Wood Products, LLC*, is not on point as it deals with the *Daubert* standard for qualifying witnesses. *See* No. 7:16-CV-244-FL, 2018 WL 6729636, at *2 (E.D.N.C. Dec. 21, 2018). But even so, the court in *Lightfoot* explicitly recognizes that it is the court's responsibility "to account for 'competing versions of the facts,' and it should not disregard [the non-moving party's] version of disputed facts when considering reliability and fit of an expert opinion." *Id.* (quotations and citations omitted). *Owens v. Auxilium Pharm., Inc.*, the last cited case, deals with a *Daubert* challenge at trial and so does not apply here. *See* 895 F.3d 971, 973 (7th Cir. 2018).

The caselaw and common sense both require the Court, not an expert witness, to evaluate the evidence in favor of the non-moving party. The Court takes under advisement the various issues raised with the Prodromos's testimony, but the Motion to Exclude is denied. We turn now to the heart of the matter—the Motion for Summary Judgement.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the

adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*. (citation omitted).

## SUMMARY JUDGEMENT ANALYSIS

The defendants have sought summary judgement on two counts. The first is a 42 U.S.C. § 1983 claim alleging that James violated Jones's Eighth Amendment rights through deliberate indifference to his serious medical needs. The second is a medical malpractice claim against James and Wexford. We consider them in turn.

### I. Deliberate Indifference

§ 1983 provides a cause of action for plaintiffs who believe their constitutional rights been violated. One such right is provided by the Eighth Amendment, which prohibits "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In evaluating whether this right has been violated, the courts first consider whether "the medical condition the plaintiff suffered was objectively serious." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), as amended (Aug. 25, 2016). In the instant case, both parties agree that Jones's ruptured patellar tendon was an objectively serious condition. So, we turn to the second step, determining whether the defendants acted with "deliberate indifference." *Id*.

A plaintiff showing a defendant's negligence or even objective recklessness, "failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known," is insufficient to establish deliberate indifference. *Id*. Instead, the plaintiff must prove that the defendants "*actually* knew of and disregarded a substantial risk of harm." *Id*. It is thus a subjective standard, turning on (1) the defendant's personal awareness of the medical need, and (2) her conscious disregard of the same. *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 989 (7th Cir. 1998).

If not proven directly, a defendant's personal awareness and disregard can be inferred. *Petties*, 836 F.3d at 728. In the medical context, however, the standard for such an inference is high. "A plaintiff can show that the [medical] professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally

11

competent professional would have so responded under those circumstances." *Collignon*, 163 F.3d at 989 (7th Cir. 1998).

Evidence of sub-minimal competence includes the "existence of documents the doctor regularly consulted which advised against his course of treatment, evidence that the patient repeatedly complained of enduring pain with no modifications in care, inexplicable delays or departures from common medical standards, or of course, the doctor's own testimony that indicates knowledge of necessary treatment" not provided. *Petties*, 836 F.3d at 731. In making this evaluation, it is important to remember that a defendant can only be held liable under § 1983 for matters under their control. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). They cannot be held to account for other elements of the prison bureaucracy that may have exacerbated the plaintiff's medical condition.

In the instant case, Jones was injured on November 14 and seen by James on November 16. On December 8, James saw Jones for the second time and referred him for an MRI. For the period between November 16 and December 8, James ordered a "conservative" course of treatment consisting of ibuprofen, rest, and crutches. James presented Jones's case to the Wexford collegial on December 15, which authorized the MRI. Both parties agree that after an off-site procedure like an MRI had been approved, James was not responsible for its scheduling. Thus, Jones's deliberate indifference case rests on the month delay between his injury and James's ordering of the MRI, as well as James's medical treatment of him during that period.

12

In practice, this reduces to a single question—whether James was actually aware that Jones' had a ruptured patellar tendon before December 8. If James was aware, then his conservative course of treatment may well have constituted a conscious disregard of Jones's serious condition. *See Conley v. Birch*, 796 F.3d 742 (7th Cir. 2015) (finding a prisoner's deliberate indifference case survived summary judgement when a doctor "strongly suspected" a fractured hand but did not order an X-ray for several days and instead prescribed "conservative" treatment of ice and ibuprofen). This is reinforced by the testimony of Dr. Vincent Cannestra, an orthopedic surgeon and expert witness for Jones, who testified that delaying surgery for patellar ruptures longer than three weeks results in sub-optimal outcomes, and of Dr. Ankhur Behl, Jones's surgeon, who testified that Jones had substantial scarring, likely due to the delay, that made the surgery more difficult. Dr. Cannestra Dep. 74:8-14, Dkt. 91-7 at 20; Dr. Behl Dep. 20:1-24, Dkt. 91-4 at 6.

Nevertheless, the evidence presented in this case is not sufficient to raise a question of fact about James's awareness of the rupture. James's testified that when he inspected Jones's knee, he found it to be a "little loose" but also that the uninjured right knee had "the same amount movement." James Dep. 28:2-16, Dkt. 91-2 at 9. He did not diagnose a patellar rupture, but ordered an X-ray to "make sure" that a rupture could be ruled out. *Id*. While James was clearly aware that a patellar rupture was a possibility to be ruled out, his testimony does not support the inference that he had diagnosed a ruptured tendon.

13

The expert testimony of both parties supports this view. Prodromos, the defendants' expert, stated in his report that the "clinical and radiologic presentations were quite atypical" and that a general practitioner would not suspect a rupture based on the symptoms presented. Prodromos Rep. 4, Dkt. 91-6. Cannestra challenges Prodromos's assessment of Jones's symptoms. *See* Cannestra Rebuttal Rep., Dkt. 100-10. According to Cannestra, James conducted an inadequate examination of Jones on November 16 by, among other issues, failing to document Jones's active range of motion, ability to lift his leg, or sensitivity to palpation. Cannestra Rep. 8, Dkt. 91-7 at 35. As a result, James "performed an inadequate physical exam of the knee, which led him to believe there was no severe or urgent injury to Mr. Jones' left knee." *Id*. At most, James can be said to have had a "concern" about a potential patellar rupture. *Id*. Thus, while the two doctors reach differing conclusions as to whether James was negligent, neither expert concludes that James was actually aware of the rupture.

The instant case is also missing those signs that the Seventh Circuit has suggested may allow one to infer actual knowledge when lacking direct evidence. *See Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016), as amended (Aug. 25, 2016). The plaintiffs have not offered any documents that James regularly consulted that advised against his course of treatment. Jones did not repeatedly complain of enduring pain without modification of care—the next time James saw Jones was December 8 when he ordered an MRI. And James did not testify that he knew some further, unordered treatment was necessary. The evidence all suggests that James, either reasonably or negligently, did not strongly suspect that Jones had a ruptured patellar tendon until

14

December 8, the day he referred him for an MRI. Without that actual awareness, James, by definition, could not have been deliberately indifferent to Jones's serious medical need.

In support of his deliberate indifference claim, Jones cites several cases surviving summary judgement arising from delays in the care of prisoners' fractures or ruptures. *See Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016); *Conley v. Birch*, 796 F.3d 742 (7th Cir. 2015); *Almond v. Wexford Health Source, Inc.*, No. 3:15 C 50291, 2020 WL 108419, at \*6 (N.D. Ill. Jan. 9, 2020). In each of these cases, however, there was evidence that the defendant was actually aware of the serious injury, raising a question of fact for trial. In *Petties*, the defendant doctor testified, and medical records confirmed, that his initial diagnosis was that the plaintiff had a torn Achilles tendon. 836 F.3d at 731. Nevertheless, he did not immobilize the defendant's ankle despite knowing that was the appropriate treatment. *Id*. This is a model example of actual awareness coupled with conscious disregard. In the instant case, in contrast, James's testimony, the records, and expert testimony all support the conclusion that James did not initially diagnose a patellar rupture.

In *Conley*, the defendant was informed over the phone by a nurse that the plaintiff's hand had throbbing pain, severe swelling, and was, in the view of the nurse, a "possible/probable fracture." 796 F.3d at 744. This evidence suggested that the defendant "strongly suspected" a fracture, and so her failure to order an X-ray for several days may have constituted deliberate indifference. *Id*. James, of course, received no third-party suggestion that Jones's patellar tendon had ruptured, and the

15

expert testimony suggests that one would not reach that diagnosis based on the initial examination he performed. There is no comparable ground for a jury to find that James "strongly suspected" the serious injury.

Finally, in *Almond*, the court found that a jury could rule on deliberate indifference when all parties agreed that the defendant suspected a quadricep tear but did not order emergency treatment. 2020 WL 108419, at *2, *6. Significantly, the court did not find that the defendant acted with deliberate indifference for the several months after the injury that she did not suspect a quadricep tear. *Id*. at *5. Potential liability only attached when, as admitted by all the parties, she become actually aware of how serious the injury was.

In each of these cases, the plaintiff offered evidence that raised a meaningful question of fact as to whether the defendant was actually aware of the severity of the plaintiff's issue. In this case, the evidence supports the view that James did not "strongly suspect" a ruptured patellar tendon until December 8, at which point he acted promptly to order an MRI. In opposition, the plaintiff offers the fact that James ordered an X-ray to "rule out" a patellar rupture, and expert testimony that a doctor meeting the appropriate standard of care would have recognized the issue at the initial appointment. The later is a question of medical malpractice, not deliberate indifference. And while the former shows that James knew a ruptured patellar tendon was a possibility, using that single fact to find actual awareness would amount to a "speculative inference." Summary judgement is granted on the deliberate indifference claim.

16

**II. Medical Malpractice**

In order to prove medical malpractice, a plaintiff must prove: "(1) the standard of care against which the medical professional's conduct must be measured; (2) the defendant's negligent failure to comply with that standard; and (3) that the defendant's negligence proximately caused the injuries for which the plaintiff seeks redress." *Sunderman v. Agarwal*, 322 Ill. App. 3d 900, 903 (2001). Generally speaking, "this standard of care must be established through expert medical testimony." *Chiero v. Chicago Osteopathic Hosp.*, 74 Ill. App. 3d 166, 172 (1979). Cannestra's expert testimony on behalf of Jones raises questions of fact on both the negligence and the proximate cause elements.

The defendants frequently claim that Cannestra "does not offer a single opinion to a reasonable degree of medical certainty." *See, e.g.*, D. Reply 11, Dkt. 106. The basis for this assertion is unclear to the Court. Cannestra's expert report concludes by stating that his opinions are offered with "a reasonable degree of medical and orthopedic surgical certainty." Dr. Cannestra Rep. 12, Dkt. 91-7 at 39. The reports and testimony make clear that Cannestra consulted the relevant materials and applied his medical expertise to the case. In so far as the defendants' assertion is based on substantive disagreements with Cannestra's opinions, it is a factual question for trial.

Returning to the elements of a malpractice claim, Cannestra's testimony claims that James repeatedly fell short of the appropriate standard of care. Drawing on James's deposition and medical notes, Cannestra concludes that James's examination

17

of Jones's knee on November 16 fell short of the standard of care. Cannestra Rep. 8, Dkt. 91-7 at 35. He describes several observations that he would have expected a competent doctor to make and which would have revealed the true extent of Jones's injury, none of which James seemed to make. *Id.* He also finds fault with James's failure to immediately order an MRI because an X-ray was not sufficient to rule out a rupture. *Id.* at 9. And he objects to James not scheduling a follow-up examination given the seriousness of the injury he observed and the substantial rest that he ordered. *Id.* All of these actions, in Cannestra's expert opinion, fall short of the standard of care to be expected of James.

What is more, Cannestra testifies that these deviations proximately caused Jones's harm by delaying his diagnosis. According to Cannestra, an orthopedic surgeon, after three weeks the efficacy of surgery to repair a ruptured patellar tendon declines due to the accumulation of scar tissue and muscle atrophy. *Id.* at 10-11. A faster diagnosis would have meant a faster surgery and a better outcome. This assessment is consistent with the testimony of Behl that Jones had a large amount of scar tissue, making the surgery more difficult, and that such tissue accumulates when surgery is delayed. Dr. Behl Dep. 20:1-24, Dkt. 91-4 at 6.

The defendants object to Cannestra's view of the facts. In particular, they contend that Cannestra ignores evidence that Jones did not present with typical symptoms and that he holds James to an unreasonably high standard for a general practitioner. While the defendants may well be correct, these are exactly the sort of questions the jury should consider. Similarly, they argue that Cannestra's causation finding should

18

be ignored because Behl testified that his surgery was "successful" despite the delay in treatment. Dr. Behl Dep. 27:16, Dkt. 91-4 at 8. But, as noted above, other passages from Behl's testimony support Cannestra's causal link. How to weigh this evidence is, again, a question of fact for the jury. As a result, summary judgement is denied as to Jones's medical malpractice claim.

## CONCLUSION

For the stated reasons, the defendant's Motion for Summary Judgment [90] is granted as to the deliberate indifference claim and denied as to the medical malpractice claim. The Motion to Exclude the defendants' expert witness [104] is denied, and the Motion to Strike certain defendant responses to Jones's statement of Additional Facts [108] is dismissed as moot.

E N T E R:

Dated: February 1, 2021

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge